UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ALBERTA POND, | ) | CIV. 07-5058-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING |
| vs. | ) | DEFENDANT'S MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

On August 21, 2007, plaintiff Alberta Pond brought suit against the government pursuant to the Federal Torts Claims Act, 28 U.S.C. §§ 2671-2680, to recover damages arising from a slip and fall incident that occurred in the parking lot of the Pine Ridge Elementary School, a public school located within the Pine Ridge Indian Reservation in Pine Ridge, South Dakota. (Docket 1). The government moves the court to grant summary judgment in its favor, arguing that, as a matter of law, the government is not liable for injuries caused by the natural accumulation of snow and ice. (Dockets 23 & 24). The government also argues, in the alternative, that it was not negligent and that Ms. Pond assumed the risk. Id. Ms. Pond resists the government's motion for summary judgment. (Dockets 31 & 32).

## FACTS AND PROCEDURAL HISTORY

This case arises from a slip and fall incident that occurred on November 30, 2005.[1] At the time of the incident, Ms. Pond was a resident of the Pine Ridge Indian Reservation in Pine Ridge, South Dakota, and lived within walking distance of the Pine Ridge Elementary School and the Pine Ridge High School. During the evening hours of November 29, 2005, snow had fallen near and around school grounds. Ms. Pond was aware that it had snowed, although it was not snowing when Ms. Pond awoke at approximately 5 a.m. on November 30, 2005.

At approximately 9:45 a.m. that day, Ms. Pond walked to the schools in order to excuse her two granddaughters from classes for the following two days.[2] The most expedient way to enter the elementary school from Ms. Pond's residence was from the west entrance, which was one of the main entrances to the school and had an overhang, stairs, and a handicap access ramp.

Ms. Pond approached the elementary school intending to use the public entrance on the south side. When Ms. Pond reached the south side,

---

[1]The following factual recitation consists of material facts undisputed by the parties. These facts are contained in the government's statement of undisputed material facts, (Docket 25), all of which were admitted by Ms. Pond. (Docket 32).

[2]One of Ms. Pond's granddaughters attended the elementary school and another attended the high school. (Docket 32, Exhibit 1, Deposition of Pond, p. 26, lines 17-18).

2

she saw a lot of ice. Ms. Pond was aware of the ice as she was walking toward the south entrance to the elementary school. She recognized that she needed to proceed carefully to avoid falling. Ms. Pond slipped and fell on the ice as she was walking.[3]

Rodney Clark, Facility Manager for the Office of Indian Education Programs, was responsible for school maintenance and employed a staff of six custodians and four maintenance people. For snow and ice removal, the maintenance department had at its disposal two tractors with front-end loaders and scraper blades, a John Deere mower with a street brush attachment, shovels, brooms, and ice melt. Although the maintenance department did not have written policies governing work completion, it did have a standard procedure for snow and ice removal. On snow days, the maintenance crew went to work early, around 6 to 7 a.m., to begin clearing snow and ice from critical student walkways between the dormitory and kitchen and then to school buildings. Clearing snow and ice from the west entrance was considered a priority, and, in situations of normal snowfall, the west entrance was usually cleared by approximately 8:30 a.m. The crew

---

[3]Directly in front of the south entrance of the elementary school is a parking lot. (Docket 32, Exhibit 1, Deposition of Pond, p. 20, lines 21-22). At the time of the incident, a white pickup truck was parked in front of the south entrance. Id. at p. 20, lines 1-17. During her deposition taken on April 16, 2008, Ms. Pond indicated that she fell somewhere behind the truck; however, in her statement of material facts, she stated that she fell a few feet from the south entrance. (Compare id. at p. 20, lines, 15-17, with Docket 32).

3

laid down ice melt after removing the snow. The crew then cleared parking

lots, including the south lot. The crew cleared the south lot between 10 and

11 a.m. on days with normal snowfall. Nothing about the south parking lot

would have caused an unnatural accumulation of snow and ice. November

30, 2005, was a normal snow day. The southern portion of the south

parking lot was used for staff parking as the northern portion was

unusable.[4]

---

[4]The following excerpt from Rodney Clark's deposition better describes the layout of the south parking lot and snow removal policies for the south parking lot:

Q: Is it normally -- if there was snow or ice on that area that we've talked about where we've kind of agreed that this is where the complaint says she fell, do you -- is this area normally a place where this chemical melt would be used or would you just use a scraper and scrape the snow off?

A: It's not a place -- as far up as she was walking, from what Robert showed me --

Q: Yeah.

A: -- as far up as she was walking, it's a place we don't normally clean because nobody's ever up there.

Q: Okay.

A: We'll usually clean the lower half where the people park, and stuff.

Q: Okay.

A: If we get time later on, after we get everything cleaned off, we'll come back and brush 'em off, yeah, but it's not a critical area for student movement or for staff movement.

Q: All right. So you're telling me that this isn't the normal way that people get into that building or an often-used way of getting into the building?

A: It's kind of a strange question.

   MR. GUSINSKY: Well, ask him to clarify it.

A: Well, the slab that we're looking at is like 60 foot wide.

Q: Okay.

A: The bottom 30 feet of it we take care of. The top 30 foot there's just usually never anybody up there and this is where she happened to be walking, apparently.

. . . .

Q: Okay. And is the south entrance to the elementary school used quite a bit?

4

Ms. Pond alleges that, as a result of the fall, she "suffered temporary

and permanent physical and emotional injury, including a brain contusion

---

A: Yes.
Q: Okay. By whom?
A: Students.
Q: Okay. And where do the students come from when they use the south entrance?
A: Usually it's coming from this 6 -- or the 7th and 8th grade buildings right here. (Pointing.)
Q: Okay. So they would walk - - –as I understand it, then, they would walk along a narrow part of the cement block and mostly on the eastern side of it, is that correct?
A: Yes.
. . . .
Q. . . . With respect to the concrete, concrete slap of -- I'm sorry, the slab of concrete that leads to the south parking, south entry into the elementary school, what area do you clear which is a high traffic area?
A: It would be this lower part down here–(pointing)–where the staff parks.
. . . .
Q: Okay. And then do you clear a little pathway going north and south leading into the south entrance as well?
A: There's a sidewalk that extends through that area right here -- (pointing) -- and that's -- we clean this for student movement.
Q: And that sidewalk leads directly to the south entry of the elementary school?
A: Yes. It's still part of this slab, but this sidewalk right here -- (pointing)–that you see, we just follow that straight in and clean that area.
Q: Okay.
A: So that when the 7th and 8th grades come in they've got a straight shot in.
. . . .
Q: Okay. On the overall scale of priority in terms of snow and ice removal, other than the pathway for the students which you marked with an arrow leading to the south entryway, the rest of the concrete slab, where does that rank on the priority level?
A: Low priority. It's a parking area, same as we would do like the staff parking on the high school or over here on the west side.
Q: Okay. And is that also because the west entrance provides sufficient entry to the elementary school and you clear that early on?
A: Yes.
. . . .
Q: Okay. And the area where Alberta fell could have been an area that–where you do not make any effort to remove snow or ice?
A: Not until later in the day, if we do remove it.

(Docket 25, Exhibit 4, Deposition of Clark, p.16, lines 9-25; p. 17, lines 1-13; p. 23, lines 19-25; p. 24, lines 1-6; p. 29, lines16-22; p. 30; lines 4-16, 24-25; p. 31, lines 1-10; p. 32, lines 3-6).

and an intercranial hemorrhage, pain and suffering, diminished quality of life, loss [sic] wages and inability to work, hospital and doctor bills, and miscellaneous costs and expenses." (Docket 1). She claims that the school and its employees and agents were negligent for failing to remove the snow and ice in a timely manner from main access areas to the elementary school, failing to follow established procedures for snow and ice removal, failing to ensure that main access areas were not dangerous or unsafe because of snow and ice, and failing to warn the public that the main access areas were covered in snow and ice. Id.

The government moves for summary judgment on the grounds that it cannot be held liable for injuries stemming from the natural accumulation of snow and ice and that Ms. Pond assumed the risk of walking on ice. (Dockets 23 & 24). Ms. Pond resists summary judgment. (Docket 31). The government's motion is ripe for consideration.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a

6

genuine issue of material fact exists. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. <u>Id.</u> at 248. Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Id.</u> (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. <u>Id.</u> However, the moving party is entitled to judgment as a matter of law if the nonmoving party has failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,

475 U.S. 574, 587-588 (1986).  The key inquiry is "whether the evidence

presents a sufficient disagreement to require submission to a jury or

whether it is so one-side that one party must prevail as a matter of law."

Anderson, 477 U.S. at 252.

## DISCUSSION

When resolving claims under the Federal Tort Claims Act (FTCA),

federal courts look to the law of the state where the tort occurred, here,

South Dakota.[5]  Washington v. Drug Enforcement Admin., 183 F.3d 868,

873 (8th Cir. 1999) (Under the FTCA, "[t]he United States is liable to the

same extent that a private person under like circumstances would be liable

to the claimant in accordance with the law of the place where the act or

omission occurred.  The 'law of the place' refers to the substantive law of the

state where the wrongful conduct took place.") (additional citations omitted);

Celestine v. United States, 841 F.2d 851, 853 (8th Cir. 1988) (*per curiam*)

---

[5]Section 1346(b)(1) of Title 28 of the United States Code confers exclusive
jurisdiction to the district courts over "civil actions on claims against the
United States, for money damages, accruing on and after January 1, 1945, for
injury or loss of property, or personal injury or death caused by the negligent
or wrongful act or omission of any employee of the Government while acting
within the scope of his office or employment, under circumstances where the
United States, if a private person, would be liable to the claimant in accordance
with the law of the place where the act or omission occurred."  28 U.S.C.
§ 1346(b)(1).

("Government liability under the FTCA is determined by the law of the place where the tort occurred . . . .") (additional citations omitted).

Under South Dakota law, a possessor of land owes an invitee a duty to exercise reasonable care for her safety. Luke v. Deal, 692 N.W.2d 165, 169 (S.D. 2005). A possessor of land may be liable to an invitee for injuries suffered by a condition on the land if, but only if, the possessor (a) knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to the invitee, (b) should expect that the invitee will not discover or realize the danger, or will fail to protect herself against it, and (c) fails to exercise reasonable care to protect her from the danger. Restatement (Second) of Torts § 343. The possessor of land has a duty to warn the invitee of concealed, dangerous conditions known to the possessor. Luther v. City of Winner, 674 N.W.2d 339, 347 (S.D. 2004). "The possessor of land is not an insurer of the welfare and safety of an invitee and therefore will not be liable when the invitee knows of the danger or the danger is obvious to the invitee." Id. (citing Restatement (Second) of Torts § 343(A)(1)). In certain cases, however, the possessor should anticipate that a dangerous condition will cause physical harm despite its obviousness and, thus, has a duty to warn the invitee or take other reasonable steps to protect the invitee against the known or

9

obvious condition.[6] Id. A possessor of land is not liable for injuries

resulting from a fall caused by the natural accumulation of snow and ice on

the property. Budahl v. Gordon and David Associates, 323 N.W.2d 853, 855

(S.D. 1982).

## A.  **Natural Accumulation of Snow and Ice**

The government moves for summary judgment on the grounds that it

cannot be held liable for injuries stemming from the natural accumulation

of snow and ice. (Dockets 23 & 24). South Dakota has few cases that

address the issue of owner liability in the context of slip and fall incidents

involving snow or ice. One such case, however, is Budahl, 323 N.W.2d 853.

In Budahl, plaintiff sued defendant to recover damages for personal injuries

---

[6]Comment (f) to the Restatement (Second) of Torts § 343A(1) clarifies
when a possessor of land should warn an invitee of an obvious danger.

Such reason to expect harm to the visitor from known or obvious
dangers may arise, for example, where the possessor has reason to
expect that the invitee's attention may be distracted, so that he will
not discover what is obvious, or will forget what he has discovered, or
fail to protect himself against it. Such reason may also arise where
the possessor has reason to expect that the invitee will proceed to
encounter the known or obvious danger because to a reasonable man
in his position the advantages of doing so would outweigh the
apparent risk. In such cases the fact that the danger is known, or is
obvious, is important in determining whether the invitee is to be
charged with contributory negligence, or assumption of risk. (See §§
466 and 496D.) It is not, however, conclusive in determining the
duty of the possessor, or whether he has acted reasonably under the
circumstances.

suffered after slipping on ice and falling on a sidewalk in front of a business owned by defendant. Id. at 853. The state circuit court granted defendant's motion for a directed verdict and dismissed the case, and plaintiff appealed to the South Dakota Supreme Court. Id. at 854.

The supreme court first addressed the issue of whether a local ordinance that imposed a duty on a property owner or occupant to clear abutting sidewalks of snow and ice gave rise to a cause of action on behalf of a pedestrian injured when the owner or occupant failed to comply with the ordinance. Id. The court found that, because the responsibility for snow and ice removal fell on the municipality under the common law, the purpose of the ordinance was to compel the owner or occupant in assisting the municipality in removing snow and ice accumulations and to hold the owner or occupant responsible to the municipality. Id. (citing with approval Clark v. Stoudt, 73 N.D. 165, 12 N.W.2d 708, 710 (1944)). The purpose of the ordinance was not to impose a standard of care for the benefit of injured pedestrians. Id. at 855 (citing Restatement (Second) of Torts § 288 (1965)). The court ultimately held that "an owner or occupant of property is not liable to pedestrians for injuries resulting from a fall caused by the natural accumulation of snow and ice on a sidewalk in front of the property, notwithstanding the existence of an ordinance that imposes a duty upon the

11

owner or occupant to remove the ice and snow and penalizes the failure to do so." Id.

The supreme court also addressed the issue of whether the state circuit court properly granted defendant's motion for directed verdict. Id. To that end, the court found crucial the issue of whether there was any credible evidence of an unnatural or artificial accumulation of ice or snow on the premises. Id. The court noted that one witness saw water run off of the overhang of the building and freeze on the sidewalk. Id. at 856. In light of this testimony, the court found that the circuit court should have permitted the jury to decide the extent of defendant's liability, if any, for the condition of the sidewalk caused by the dripping water. Id. The court remanded the case to the circuit court for trial on that issue. Id. The court, however, affirmed the circuit court's order to the extent that it was based on the denial of plaintiff's claim that defendant violated a general duty to remove ice and snow. Id.

This district has addressed a similar issue in Sauer v. United States, CIV. 04-1021 (Docket 31) (D.S.D. 2006), a case arising under the FTCA in which the court applied Budahl to a slip and fall incident that occurred in a business parking lot. In Sauer, plaintiff, a 60-year-old woman with a history of injuries caused by falling, slipped and fell on ice in the parking lot of a post office building during a snow and ice storm. Id. Intending to pick

up her mail, plaintiff had walked to the post office on her way to work and had to cross a parking lot to reach the entrance to the building. Id.

Although the postal service had no written policy regarding snow and ice removal in the parking lot, it was customary for the local co-op to plow the parking lot and for the city to spread sand on the parking lot after the snow was removed. Id. During the morning of the incident, the co-op had cleared the parking lot, but strong winds caused blowing snow to settle immediately. Id. A postal employee noticed that the parking lot was icy and that the snow was drifting in right behind the plow. Id. The driver of the snow plow and ambulance personnel stated that ice was underneath the snow in the area where plaintiff fell, but the streets were not icy. Id.

In moving for summary judgment, the government argued, in part, that, under South Dakota law, an owner or occupant of property was not liable to pedestrians for injuries sustained by a fall caused by the natural accumulation of snow and ice. Id. The district court agreed, citing Budahl, *supra*, and granted summary judgment in favor of the government. Id. In viewing the facts of the case, the court determined that the snow froze simply because it was wet, naturally causing ice to form underneath. Id. In finding defendant not liable for plaintiff's injuries, the court reasoned as follows:

> If the ice that caused plaintiff to slip and fall was a result of the natural accumulation of ice under wet snow during a heavy snow

13

and ice storm, defendant cannot be held negligent. If the ice was a result of freezing and thawing from the snow piled adjacent to the parking lot, that would not be the natural accumulation of ice. Plaintiff contends that the snow should have been pushed back further from the parking lot. The postal service had nothing to do with the methods of snow removal. Any claimed negligence in placing snow where it could melt and freeze, causing icy conditions thereto, would be the responsibility of someone other than defendant. Defendant is not liable.

Id. at p. 6.

In the instant case, the court acknowledges that Ms. Pond admitted that "[t]here is nothing on the south lot, where Pond fell, that would cause unnatural accumulation of snow and ice." (Docket 25 & 32). Further, it is clear that Ms. Pond does not take issue with the parking lot structure itself, e.g., the layout or condition of the parking lot surface. Nor is this a situation where, as suggested by the district court in Sauer, a maintenance crew improperly removed and piled snow, thereby causing unnatural water runoff that later froze. Ms. Pond does not assert nor is there evidence, for example, that frequent vehicle traffic had caused slush and ice to accumulate on the parking lot or that the removal of the snow was haphazard.

Ms. Pond's case is distinguishable from Budahl because, here, the elementary school established the standard of care owed to the public as set forth in its maintenance policies and directions to its maintenance crew. Additionally, Ms. Pond's case is distinguishable from Sauer in one important

14

aspect, and, thus, the court declines to follow its holding. Sauer involved a pedestrian walking in a parking lot *during* a snow and ice storm. Prior to the incident, the local co-op had cleared the parking lot of snow and ice, yet strong winds caused blowing snow to drift and settle immediately behind the snow plows. Conversely, in Ms. Pond's case, it was not snowing on the day of the incident, and the school's maintenance crew had taken no steps to remove the snow and ice prior to the incident.

Ms. Pond had the right to enter the elementary school through the south entrance since that was a public entrance. It is an issue for trial whether the school had a duty to create safe walking conditions near and around the south entrance to the school and whether the school violated any such duty. Because the south entrance was open to the public, a genuine issue of material fact exists as to whether the school exercised reasonable care in maintaining the south parking lot.

Mr. Clark indicated that the school's maintenance crew cleared the south parking lot between 10 and 11 a.m. on days with normal snow fall. Again, the presentation of evidence at trial will determine whether the maintenance policy and the actions of the maintenance crew satisfied the duty of reasonable care owed by the school to an invitee such as Ms. Pond.

**B. Assumption of the Risk**

In the alternative, the government argues that, if the court should find the school negligent in its snow removal practices, the affirmative defense of assumption of the risk applies to relieve the government of liability. The court disagrees that summary judgment is appropriate on that basis.

Under South Dakota law, to prove assumption of the risk, the government must show that " 'the plaintiff: (1) had actual or constructive knowledge of the risk; (2) had an appreciation of its character; and (3) voluntarily accepted the risk, having had the time, knowledge, and experience to make an intelligent choice.' " Pettry v. Rapid City Area School District, 630 N.W.2d 705, 708 (S.D. 2001) (quoting Mack v. Kranz Farms, Inc., 548 N.W.2d 812, 814 (S.D. 1996)). " 'Assumption of the risk is an affirmative defense and failure to establish any one of the above three criteria is fatal.' " Id. (quoting Mack, 548 N.W.2d at 814).

In reviewing Ms. Pond's deposition testimony and written statement, the court finds that genuine issues of material fact exist as to whether Ms. Pond had actual or constructive knowledge of the ice on school grounds, appreciated the risk of slipping on the ice, and voluntarily accepted the risk of walking on an ice-covered surface. First, it is unclear as to the exact location of Ms. Pond's fall. At one point in Ms. Pond's deposition, she stated that she "wasn't too far from that [school] door."

(Docket 32, Exhibit 1, Deposition of Pond, p. 16, lines 14-15). Later in her deposition, Ms. Pond stated that she fell somewhere behind a white pickup truck parked in front of the door. Id. at p. 20, lines 15-17. On a picture of the south parking lot and south entrance, Ms. Pond marked the approximate location of her fall, which appears to the court to be at least 20 feet from the door. (Docket 25, Exhibit 3). In Ms. Pond's statement of material facts, she stated that she fell only a few feet from the door. (Docket 32). It is necessary to determine at trial in what area Ms. Pond fell and, importantly, whether Ms. Pond, as a member of the public, should have expected snow and ice to be present. For example, if Ms. Pond fell within a few feet of the south entrance, an entrance used by staff members and the public, albeit to a lesser extent than the west entrance, a question arises as to whether it was reasonable for Ms. Pond to expect the area to be clear of snow and ice.

Further, it is unclear from the record whether the ice covered the entire south parking lot or just suddenly appeared in the area of her fall. It is unclear as to which areas of the south parking lot were covered with ice. It is unclear if the icy patch was large or small. It is unclear whether Ms. Pond had been walking on ice for some distance before falling or whether the ice suddenly appeared and she was attempting to cross it when she fell. The following excerpt from Ms. Pond's deposition illustrates this ambiguity:

17

Q: So then you continue saying on Exhibit 7,[7] When I got to the school grounds on the south side of the elementary school, I realized there was a lot of ice on the school grounds and that I would have to be careful of falling.

A: Yes.

Q: Was there a lot of ice?

A: As I walked from my house until I fell, it wasn't -- it wasn't that bad. I'm always careful, regardless of what. And then all of the sudden I stepped on the ice. It was just there, and --

Q: Well, so are you saying that your statements in Exhibit 7 is not accurate when you state that when I got to the school grounds on the south side of the elementary school, I realized there was a lot of ice on the school grounds and that I would have to be careful of falling?

A: That is accurate.

Q: That is accurate?

A: Yes, it is.

Q: So, as you got to school grounds, you realized you'd have to be careful?

A: I knew it was very, very icy through there because the road -- they hadn't cleared anything.

Q: So the ice didn't just kind of suddenly appear on you. I mean, you knew that there was ice out there and that you'd have to be careful?

A: When I made that statement there, all of the sudden that ice was there, it hadn't been that icy before until I got close.

Q: Okay. But that's -- let me interrupt you. We're playing games here. I mean, that's not what you said a second ago and that's not what you're saying in your statement. In your statement in Exhibit 7, and that's all I want to know is whether or not this is an accurate statement.

A: Yes, it is.

Q: When I -- okay. Well, in your statement you say, When I got to the school grounds on the south side of the elementary school, I realized there was a lot of ice on the school grounds and that I would have to be careful of falling. That is an accurate statement, correct?

---

[7]Exhibit 7 refers to the written statement provided by Ms. Pond. The government included Ms. Pond's statement as an attachment to its statement of undisputed material facts. (Docket 25, Exhibit 2).

A:    Yes, it is.

Q:    Okay. So my question is, the ice didn't just kind of suddenly appear on you. You knew that there was ice as you were walking to the door of the elementary school, correct?

A:    Correct.

Q:    All right.

A:    May I say something?

Q:    Sure.

A:    Okay. Apparently, I don't have that worded right. Because when I was going, okay, and when I fell, it just was just ice, more than I just walked up to it when it was just apparently pure ice. And I realized then I had to be very careful, because it was very --

Q:    But you realized you had to be careful before you fell, correct?

A:    Uh-huh.

Q:    Is that a "yes" or a "no?"

A:    Yes.

Q:    And you could have just simply turned around and gone back if it was too dangerous, correct?

A:    Yes, I could have.

(Docket 32, Exhibit 1, Deposition of Pond, p. 32, lines 1-25; p. 33, lines 1-25; p. 34, lines 1-12).

These questions are material to the assumption of the risk analysis because they speak to whether Ms. Pond had actual or constructive knowledge of the risk and had the time and opportunity to appreciate the character of the risk. Ms. Pond testified that the path from her home to the south parking lot "wasn't that bad." Id. at p. 32, lines 7-8. She asserts that she walked without difficulty from her home to within a few feet of the school doors. (Docket 31, p. 5). It was not snowing nor had it been snowing the morning of the incident. The record is unclear as to whether Ms. Pond was walking on the ice for some distance or whether the ice suddenly

appeared. This issue is material as to whether Ms. Pond had notice of the ice before attempting to cross it, whether she had the time and opportunity to recognize the risk of crossing the ice before attempting to do so, and whether her attempt to cross the ice was reasonable in light of the totality of the circumstances. In short, these questions are relevant to the issues of negligence and assumption of the risk and should be resolved by trial.

The court also notes that Ms. Pond alleges that two other people, Ed Biers and Kay Flock, fell near the *west* entrance of the school on the same day of Ms. Pond's injury. (Docket 31 at p. 2; Docket 32 at p. 2; Docket 32, Exhibit 1, Deposition of Pond, p. 43, lines 1-25; p. 44, lines 1-7). She learned this information from an unknown individual. (Docket 32, Exhibit 1, Deposition of Pond, p. 43, lines 15-16). Although hearsay, this information is not vague or general in nature since Ms. Pond identified the individuals by name and the approximate location of their falls. This information, if corroborated by Ed Biers and Kay Flock at trial, is germane to the issue of whether the maintenance crew properly removed snow and ice near and around the west entrance, which Mr. Clark identified as a priority entrance, on the day in question. If two people fell near a priority entrance, a question arises as to whether the maintenance crew's removal efforts on November 30, 2005, failed to satisfy the standard of care owed to pedestrians seeking access to the school through public entrances.

The court must also consider whether Ms. Pond voluntarily accepted the risk of walking on ice, a question that "largely depends on the existence of a 'reasonable alternative course of conduct' open . . . [to Ms. Pond] to avert harm . . . ." Pettry, 630 N.W.2d at 708 (citing Mack, 548 N.W.2d at 815) (additional citations omitted). Reasonableness " 'refers to whether the plaintiff had a reasonable opportunity to elect whether or not to subject himself to the danger.' " Mack, 548 N.W.2d at 815 (quoting Berg v. Sukup Mfg. Co., 355 N.W.2d 833, 835 (S.D. 1984)).

A genuine dispute of material fact exists as to whether Ms. Pond had a reasonable alternative to entering the elementary school other than through the south entrance. Ms. Pond's deposition explains why she chose to approach the elementary school to use the south entrance.

> Q: And then I take it -- let's see. If you look at Exhibit 1, you entered the school grounds and walked to the place where you fell down, right?
> A: Yes.
> Q: And there's no sidewalk there, is there?
> A: Not up here, there isn't. (Indicating.)
> Q: It's just a parking lot and a driveway?
> A: Cars park here, uh-huh, and --
> Q: Are there any sidewalks you can take that are somewhere, you know, out to the right of where the picture would be that would lead you to the door you were trying to go to?
> A: Only sidewalk, if I went clear up this way around these buildings and then there's a sidewalk through there to the school. But I just go -- (Indicating.)
> Q: You just do a shortcut --
> A: Uh-huh.
> Q: -- across the parking lot, correct? But there is a sidewalk and a pathway that you could have taken, even though it's longer?

A: I could have went down this door, yes, and into that building.

Q: Any particular reason why you didn't?

A: Because I had one granddaughter in high school, and when I have to go to both schools, I usually go through this door and just go out the back. You know, out this back door and come into the back door of the high school. (Indicating.)

Q: And this is, when you say "this door," you're pointing to the door that we discussed on Exhibit 1, correct?

A: Yes.

Q: All right.

A: If it's just elementary, then I go in the front door. (Indicating.)

Q: And on November 30, 2005 did you have to go to both schools?

A: Yes, I did.

Q: All right. If you go in through the elementary door, can't you then walk through the hallway and eventually get to the high school?

A: Yes, I can. But on that day I was going to go to the high school building first.

Q: But was there anything to prevent you from going into the elementary school and walking inside in the hallway instead of through the parking lot?

A: No. Just that fact that I was taking the shortcut to the high school.

(Docket 32, Exhibit 1, Deposition of Pond, p. 24, lines 19-25; p. 25, lines 1-25; p. 26, lines 1-15).

The government argues Ms. Pond could have avoided the risk by simply calling the school to excuse her granddaughters or by entering the school via the west door. (Dockets 24 & 35). However, it appears that Ms. Pond often used, without incident, the shortcut between her home and the elementary school via the south entrance. Whether Ms. Pond should have realized on November 30, 2005, that her shortcut was dangerous is a question for trial. Whether Ms. Pond, upon encountering the ice in the

south parking lot, should have turned around and proceeded to the west entrance also is a question for trial. If Ms. Pond was already on the ice before she recognized her dilemma, perhaps turning around and taking a different path would not have been reasonable.

Further, the allegation that two other people fell near the west entrance calls into question the viability of using the west entrance. The South Dakota Supreme Court addressed a similar issue in Pettry, a case where plaintiff slipped and fell on ice in front of a school gymnasium and sued the school district and its maintenance workers. Pettry, 630 N.W.2d at 707. The state circuit court found that plaintiff assumed the risk and granted summary judgment in favor of defendants. Id. at 707-708. In granting summary judgment, the circuit court reasoned that plaintiff could have parked on the street and safely walked a block to the school, but instead plaintiff parked in the riskier playground area simply because it was more convenient and closer to the gymnasium. Id. at 708-709. The South Dakota Supreme Court reversed, finding that the record provided conflicting testimony as to whether plaintiff had a reasonable alternative available to her. Id. The court considered plaintiff's testimony that the street was also icy, prompting her to park on the school playground because it was closer to the gymnasium entrance. Id. at 709. The court reasoned that, because the street was icy and further away, the more reasonable choice would have

been to park on the icy playground, which plaintiff did, as the playground was only a few steps from the gymnasium. Id. The court found that reasonable minds could differ as to whether parking on the street was a viable alternative. Id. The supreme court reversed and remanded, holding that this issue was a question for the jury. Id.; see also Mack, 548 N.W.2d at 814-815 (finding summary judgment inappropriate where the record contained conflicting arguments as to whether plaintiff had a reasonably available alternative). In the instant case, if the maintenance crew failed to properly remove snow and ice from the west entrance, then a genuine issue of material fact exists as to whether using the west entrance was a reasonable and available alternative.

The issues discussed in this opinion are properly resolved by trial. Accordingly, the court finds that summary judgment is inappropriate based on the record presented by the parties at this time.

## CONCLUSION

In accordance with the above discussion, it is hereby

ORDERED that the government's motion for summary judgment (Docket 23) is denied.

Dated January 28, 2010.

BY THE COURT:

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE